Filed 8/8/16  P. v. Price CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ANDRE LASHAUN PRICE,<br><br>　　　Defendant and Appellant. | B262143<br><br>(Los Angeles County<br>Super. Ct. No.BA415163) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed.

　　　　Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Andre Leshaun Price appeals from the judgment entered following his conviction by jury for second degree murder. He contends there was insufficient evidence to support his conviction. He further argues the trial court erred in failing to instruct the jury on the lesser included offense of involuntary manslaughter. We affirm.

# PROCEDURAL HISTORY

The Los Angeles County District Attorney (the People) filed an information on September 25, 2013 charging defendant with the murder of Jeffrey Davis (Penal Code section 187, subd. (a),[1] count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1), count 2). As to count 1, the information further alleged that defendant personally and intentionally discharged a handgun causing great bodily injury and death within the meaning of section 12022.53, subdivisions (b), (c), and (d). With respect to count 2, the information alleged that the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang pursuant to section 186.22, subdivision (b)(1)(A). The People also alleged that defendant suffered a prior felony conviction within the meaning of section 667, subdivisions (a)(1) and (b) through (i). Defendant pleaded not guilty and denied the allegations.

The court granted defendant's motions to bifurcate the gang allegation and prior conviction allegations for trial.[2] On May 8, 2014, the jury found defendant not guilty of first degree murder on count 1, but guilty of the lesser included offense of second degree murder. The jury found not true the firearm enhancement on count 1, and acquitted defendant on count 2 of possession of a firearm by a felon. Following a subsequent court trial, the court found true the allegations regarding defendant's prior felony conviction. The court denied defendant's motion to strike the strike conviction and his motion for a new trial.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] Subsequently, the People moved to strike the gang allegation for the purposes of the trial.

The court sentenced defendant to 35 years to life, comprised of a base term of 15 years to life on count 1, doubled pursuant to section 667, subdivisions (b)-(i), and an additional five-year enhancement pursuant to section 667, subdivision (a)(1). The court also imposed various fines and fees, and awarded defendant 517 days of custody credit.

Defendant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

Defendant was a friend of Rodney Longmiyer. Longmiyer's cousin, Andrea Fowler, was a friend of the victim, Jeffrey Davis. The People's theory at trial was that defendant, Longmiyer, and Fowler planned to rob Davis, and that in the course of that robbery, defendant assaulted Davis, and that Longmiyer or defendant then fatally shot him. The following evidence was adduced by the prosecution at trial.

#### A. *Shooting of Jeffrey Davis*

Witness Jennica Chaparro testified that she was in her apartment on August 2, 2012 at around 1:30 p.m. when she heard two gunshots from the alley behind the building. Her apartment building was located on Western Avenue, between 92nd and 94th Street, in Los Angeles. The alley ran behind the building to the east, stretching parallel to Western Avenue in a north-south direction.

A few seconds after Chaparro heard the gunshots, she looked outside and saw three cars in the alley. Two of the cars were darker colored sedans, either black or blue; Chaparro described one as "like a Thunderbird" and the other as a four-door, compact car, like a Honda or Nissan. The third car was an "older classic model car." She saw people in the cars and believed they were all African-American males, but she could not see their faces. As she watched, Chaparro saw the compact car and the "classic car" proceed south down the alley toward 94th Street. Then the Thunderbird "slowly rolled

3

back" southward and out of view. Chaparro testified that she did not see any of the cars again that day and did not see anyone get shot.[3]

Fowler called 911 at 1:32 p.m. on August 2, 2012 from her home phone.[4] She reported that "something just happened" in the alley at 92nd and Western. When asked what happened, Fowler told the operator: "I don't know. Me and my friend pulled up and some guy started to rob us." Fowler then said that "somebody shot my friend." During the call, Fowler called out "Jeffrey!" several times, asked the 911 operator to "please help me," and then began to cry. She gave no further information and the call ended. The 911 operator attempted to call her back but the call was routed to voicemail.

Officer Vincent Han of the Los Angeles Police Department (LAPD) responded to a radio call at approximately 1:35 p.m. regarding a shooting in the alley at 92nd Street and Western Avenue. He canvassed the area but did not discover any gunshot victims or get any witness reports regarding the shooting. He then received a report that the victim (Davis) and a witness (Fowler) were at a hospital nearby.

At the hospital, another officer gave Han the keys to the Mazda 6 in which Davis and Fowler arrived. Han secured the car and then spoke to Fowler. During their interview, Fowler was "calm at first," but then "broke down in tears." Davis was transported to another hospital, where he was pronounced dead.

Deputy medical examiner Juan Carrillo conducted the autopsy on Davis. Carrillo described Davis as an older black male, approximately 60 years old, with his hair in short braids. Davis died from a gunshot wound to the chest. The entry wound was located on Davis's left side, about halfway down his torso, and the exit wound was in his right chest. There was a muzzle imprint at the entry wound, meaning that the tip of the gun "was in

---

[3] At trial, the People showed Chaparro photos of a two-toned Buick Century and a black Ford Thunderbird, which she had previously been shown by investigating detectives. Chaparro testified that both cars looked "familiar" and similar to the "classic car" and the Thunderbird she had seen in the alley on August 2, 2012. However, when shown the photos in 2013, she was unable to identify the cars.

[4] Based on evidence collected in the alley, police concluded the shooting occurred behind the apartment building at 9320 Western Avenue. Fowler's apartment building was located at 9300 Western Avenue, just north of that location.

4

contact with the skin when it was discharged." Carrillo determined that the death was a homicide.

Davis sustained other injuries shortly before his death: a red contusion above his right eye, contusions to the inside of both his upper and lower lips, bruising on the right and left side of the scalp, two three-inch abrasions across his left upper chest, a dark abrasion on the back of his right shoulder near the top, two separate bruises on the top of his right hand, an abrasion on his right palm below the thumb, and several abrasions on his left leg and knee. Based on his injuries, Carrillo opined that Davis was involved in a physical struggle. The injuries to Davis's hand indicated that "there were either punches thrown or attempts to ward off injury by trying to block a blow or an attack."

B.    *Investigation*

LAPD Detective David Ross investigated the alley a few hours after the shooting occurred. He observed items on the ground, including a $20 bill, a few pennies, bullet fragments, some braided hair, and what appeared to be blood.

Around 6:00 p.m. that evening, Detective Ross spoke to Fowler at the police station. Fowler told Detective Ross that before the shooting she and Davis, the victim, had gone to a nearby apartment building and also to a liquor store at 92nd Street and Western Avenue. Fowler stated she did not go into the apartment building, but waited in the car while Davis went in. Fowler also told Detective Ross that she had made the 911 call from her home phone (number ending in -1333) because her cell phone had been broken that day.

After her interview, Detective Ross drove Fowler home to her apartment at 9300 Western Avenue. Detective Ross testified that the rear of Fowler's building faced the same alley where the shooting occurred, about fifty yards north of where the items related to the shooting, including money and hair, had been found.

LAPD detectives secured surveillance video for the date of the shooting from the apartment complex and liquor store Fowler said she and Davis had visited. Both videos showed the same two individuals, identified at trial as Fowler and Davis.

5

Contrary to Fowler's statement to Detective Ross that she had waited in the car, the video footage showed both Fowler and Davis entering the lobby of the apartment building at 1:04 p.m. and then entering an apartment. Davis was carrying a white bag in his hands when he entered the apartment. About six minutes later, Fowler and Davis left the apartment empty-handed and returned to their car.

The liquor store video showed a car parking in its parking lot at 1:17 p.m. Davis got out of the car and walked toward the store. A few minutes later, Fowler joined Davis in the store. At 1:25 p.m., the car left the parking lot, heading toward the alley just east of Western Avenue. From the liquor store, that alley crosses 92nd Street and extends south to the site of the shooting about a block away.

Another LAPD investigator testified at trial regarding items recovered from the Mazda 6 used by Davis and Fowler on the day of the shooting. A red stain on the car's front passenger seat tested positive for blood. Among other items, the car contained a $10 bill on the driver's seat and a hat and cordless home phone on the passenger seat. There also were two receipts from a pharmacy in Mission Viejo, in Orange County, one from the date of the shooting. The police also recovered two cell phones from under the driver's seat of the car. Detective Ross determined that one of the cell phones belonged to Davis (number ending in -5403) (Davis's phone). The police electronically copied the contents of Davis's phone.

C.    *DNA evidence*

Prior to the autopsy, the coroner's office collected "touch DNA" (i.e., DNA left behind when a person touches something) from Davis's body, including from the palms and "knuckle region" of each hand. Samuel Sund, a criminalist with the LAPD DNA/serology unit, compared these samples to the DNA profiles from reference samples collected from Davis and from defendant.[5] The results from the swabs of Davis's palms

---

[5] Reference samples provide a known source of an individual's DNA for use in a comparison analysis. Davis's reference DNA sample was taken from blood drawn during his autopsy. Defendant's reference DNA sample was collected in August 2013 by swabbing the inside of his cheek.

and left knuckle matched Davis's own DNA profile from his reference sample.  By contrast, Davis's right knuckle swab contained showed DNA from at least two individuals.  Sund concluded that the DNA results were "approximately eight hundred million times more likely to occur if [defendant] is the second contributor, versus an individual chosen at random."  In other words, it was eight hundred million times more likely that the second contributor of DNA to Davis's knuckle was defendant rather than some other individual.

D.    *Testimony of Julie Legardye*

Julie Legardye was a key witness, both during the investigation and at trial.  She provided crucial testimony regarding the relationships between defendant and the other alleged perpetrators, as well as information regarding cell phones and cars.  The police used this information during the indentification to identify defendant and trace his and Longmiyer's movements on the day of the shooting.

Rodney "Pooh" Longmiyer was Legardye's boyfriend and the father of her daughter.  In 2012, Longmiyer stayed with Legardye several nights a week at her house on Parmelee Avenue near 112th Street.  Defendant, who Legardye knew as "Flintstone" or "Stone," was a friend of Longmiyer.  Legardye testified that she knew defendant "from around" and met him through Longmiyer about four or five years ago.  Legardye had also known Andrea "Angie" Fowler for about eight or nine years.  Fowler was Longmiyer's cousin.  Legardye, Longmiyer, and Fowler lived together briefly in Longmiyer's grandmother's house, and Legardye testified that she would see Fowler "all the time."

Legardye testified that she and Longmiyer purchased a black 2004 Pontiac Grand Prix during the first half of 2012.  Longmiyer usually drove it, and was driving it in August of 2012.[6]  Legardye stated that she registered the car using defendant's name, as

---

[6] During her third interview in July 2013, Detective Ross showed witness Chaparro a photo of the Grand Prix owned by Legardye and Longmiyer.  She said the car in the photo could possibly be the dark compact sedan she had seen in the alley at the time of the shooting.

well as the name of one of her friends, because neither she nor Longmiyer had valid driver's licenses. The registration listed Legardye's address on Parmelee Avenue.

Detective Ross interviewed Legardye on August 1, 2013. The police also copied her contacts from her cell phone, which included a phone number under the name "Flintstone" that Legardye testified was defendant's number (ending in -0577) (defendant's phone). She also identified Fowler's cell phone number (ending in -9169) (Fowler's cell phone) from her phone contact list.

Legardye stated that she had several phones during the period of July and August 2012. The first was a pre-paid flip phone with the number ending in -2857. During her 2013 interview, Legardye stated that she and Longmiyer were the only two people who used that phone. She also stated that she did not use the phone, because the prepaid minutes ran out quickly. Legardye further claimed she had lost the phone in April or May of 2011. However, at trial, Legardye testified that she had the phone until August 22, 2012, when she got a new phone for her birthday. She also testified that Longmiyer only used the phone when he was in her house, which she had not told the detectives in 2013.

Legardye identified a second phone as a Metro PCS phone with the number ending in -2692. She stated she and Longmiyer used this phone in July and August 2012. She told Detective Ross in 2013 that this was her "permanent phone."

E.     *Phone records*

The People presented extensive cell phone record evidence at trial to show the movements of Davis, Fowler, and Longmiyer on the day of the shooting, as well as the calling activity between them and defendant. The custodian of records for Sprint testified regarding the phone records for Fowler's cell phone and Davis's phone. Likewise, the custodian of records for Verizon Wireless explained the phone records for the pre-paid flip phone used by Legardye and Longmiyer with number ending in -2857 (Longmiyer's

8

phone).[7] The People also presented maps of the cell tower sites used by those three phone numbers on the day of the shooting.

The phone records showed activity on Davis's phone in Orange County on the morning of August 2, 2012 and then in Los Angeles from about noon forward. Fowler's cell phone shows the same pattern of activity, contrary to her statement to Detective Ross that her cell phone was not working that day.

The records also showed many calls among Longmiyer, defendant, and Fowler that morning. Just before 8:00 a.m., Longmiyer's phone made several calls to Fowler's home phone (number ending in -1333) and then defendant's phone made several calls to Longmiyer's phone. Longmiyer's phone and Fowler's cell phone exchanged several text messages between 10:38 and 10:41 a.m. Then, at 11:04 a.m., Longmiyer's phone called defendant's phone. At 11:15 a.m., Fowler's cell phone called Longmiyer's phone. Defendant's phone called Fowler's cell phone at 11:17 a.m. At 11:30 a.m., defendant's phone called Longmiyer's phone. Then Longmiyer's phone called Fowler's cell phone at 11:48 a.m. Longmiyer's phone and Fowler's cell phone exchanged several calls between 12:47 and 1:17 p.m., the last one going to voicemail. At 1:18 p.m., while Davis was in the liquor store, his phone was used to call Longmiyer's phone. This is the only call between Davis and Longmiyer reflected in the several weeks of cell phone records introduced.

There were no calls between defendant's phone and Longmiyer's phone between 11:30 a.m. and 2:14 p.m. on August 2, 2012. With respect to Fowler's cell phone, between 1:42 p.m. and 8:17 p.m., all calls went to voicemail, including calls from Longmiyer's phone at 1:42 p.m., 2:02 p.m., and several other calls between 5:10 p.m. and 5:43 p.m..

The phone records also established the approximate location of the caller, by showing the first and last cell tower used by the phone for each call. Early in the

---

[7] The police attempted to retrieve defendant's cell phone records from 2012 after he was identified as a possible suspect in 2013, but the phone company no longer had these records.

9

morning on August 2, 2012, Longmiyer's phone calls used a cell tower near the Parmelee Avenue home where he often stayed with Legardye. Between 11:55 a.m. and 12:47 p.m., Longmiyer's phone used a cell tower several miles south of the shooting location on Western Avenue. Then, between 1:17 and 1:32 p.m., Longmiyer's three calls to and from Fowler's and Davis's phones all used a cell tower less than half a mile from the shooting. After that time, Longmiyer's phone moved away from the site of the shooting and ultimately back toward the site of Legardye's home.

## II.     Defense Evidence

Mark Taylor testified as a DNA expert for the defense regarding the different types of DNA transfer that could occur. For example, according to Taylor, a primary transfer can occur when an individual shakes another individual's hand and some of his or her DNA transfers to the other person's hand. With a secondary transfer, the second individual might touch another surface and transfer some of the first individual's DNA to that surface. Taylor also asserted that additional levels of transfer are possible, including tertiary and quaternary, but acknowledged that "the farther out you get, the less likely [transfer] becomes." He also stated that there is no way to tell what type of transfer occurred by looking at the DNA profile testing. During cross-examination, he acknowledged that a punch could transfer one person's DNA to the other's knuckles.

DISCUSSION

## I.     Second Degree Murder Conviction

Defendant challenges the sufficiency of the evidence supporting his conviction for second degree murder. In reviewing a claim of insufficient evidence, the proper test is "'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Moreover, "'[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or

10

falsity of the facts on which the determination depends. [Citation.]'" (*Ibid*.) Thus, "[i]f the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.) The standard of review remains the same in a case based upon circumstantial evidence. (*People v. Proctor* (1992) 4 Cal.4th 499, 528-529.)

In this case, the People's primary theory at trial was that Fowler, defendant, and Longmiyer attempted to rob Davis, Davis resisted, and either Longmiyer or defendant shot him. As such, the People argued defendant was guilty of first degree felony murder.[8] The jury also was instructed regarding first and second degree murder with malice aforethought (§ 187, CALCRIM Nos. 520, 521) and aiding and abetting (CALCRIM No. 401).

In acquitting defendant of first degree murder, the jury implicitly failed to find that defendant engaged in a robbery or attempted robbery beyond a reasonable doubt. The jury also found the gun use enhancement not true thus failing to find beyond a reasonable doubt that defendant personally used a gun against Davis. Given these results, defendant argues that the evidence was also insufficient to sustain his conviction for second degree murder, either as the shooter or under an aiding and abetting theory. We disagree.

A.     *Inconsistent Verdicts*

As an initial matter, we reject defendant's contention that we are required to restrict our review of the record to defendant's potential liability as an aider and abettor, in light of the jury's not true finding on the personal gun use enhancement. In essence, defendant argues that a conviction for second degree murder as the shooter would be inconsistent with the negative finding on the gun allegation, because the negative finding demonstrates that the jury "believed he was not the shooter." However, even if the verdicts were inconsistent, "[i]t is well settled that, as a general rule, inherently

---

[8] One who unlawfully kills a human being during the commission of a robbery or an attempted robbery is guilty of first degree murder under the felony-murder rule. (See *People v. Young* (2005) 34 Cal.4th 1149, 1175; §§ 187, 189.)

11

inconsistent verdicts are allowed to stand." (*People v. Lewis* (2001) 25 Cal.4th 610, 656; see also *People v. Lopez* (1982) 131 Cal.App.3d 565, 569 [inconsistency between guilty verdict on assault with deadly weapon and negative finding on dangerous weapon enhancement allegation did not require reversal]; *People v. Federico* (1981) 127 Cal.App.3d 20, 31 [inconsistency between verdict of murder, which was result of gunshot wounds, and finding that defendant was not armed with firearm did not require reversal]; § 954 ["An acquittal of one or more counts shall not be deemed an acquittal of any other count."].) Moreover, "the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918.) Sometimes, "the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (*Id.* at p. 919.) All that is required is that each juror is convinced of guilt beyond a reasonable doubt. (*Ibid.*)

Accordingly, the jury's not true finding regarding the personal gun use allegation against defendant does not limit the scope of our review for substantial evidence supporting his conviction for second degree murder. In any event, we need not reach the issue of defendant's liability as a direct perpetrator because we conclude substantial evidence supports his conviction as an aider and abettor.

B.     *Aiding and Abetting*

A person who aids and abets the commission of a criminal offense is considered a principal in the crime. (§ 31.) "We have defined the required mental states and acts for aiding and abetting as: '(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 116-117.)

12

As to the first question, assuming defendant was not the shooter, the Attorney General contends that the evidence supports the conclusion that Longmiyer committed second degree murder by shooting Davis at close range.[9] Defendant does not challenge this proposition, and we agree the record supports it. Davis was shot point blank in the chest, at such close range that the gun left a mark on his skin. This manner of shooting is sufficient to establish malice. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1218 ["The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill."].) Further, the cell phone evidence suggests that Longmiyer made several calls to and from Fowler, who was with the victim, about ten minutes prior to the shooting.[10] During these calls, Longmiyer's phone used the cell tower less than half a mile from the site of the shooting. Chaparro, the witness, identified Longmiyer's car, the black Grand Prix, as possibly one of the cars she saw in the alley at the time of the shooting. Thus, a jury could reasonably infer that Longmiyer shot Davis and thereby committed second degree murder.

We next turn to the question of defendant's liability for aiding and abetting the shooting committed by Longmiyer. No particular factor is dispositive in establishing knowledge and intent; the court must look at the totality of the circumstances. (*People v. Medina* (2009) 46 Cal.4th 913, 922.) "Among the factors which may be considered . . .

---

[9] "Second degree murder is the unlawful killing of a human being with malice aforethought, but without the premeditation, deliberation and willfulness necessary to elevate the offense to first degree murder. [Citation.]" (*People v. Bohana* (2000) 84 Cal.App.4th 360, 368.) Express malice murder requires an intent to kill. (§ 188; *People v. Saille* (1991) 54 Cal.3d 1103, 1114.)

[10] Although defendant argued at trial that the prosecution failed to establish Longmiyer's use of this particular phone that day, we find sufficient evidence in the record to reasonably conclude that Longmiyer was using the phone. In addition to the use of the phone in the same area where Chaparro identified a car that looked like Longmiyer's Grand Prix, the frequent calls with defendant were inconsistent with use of the phone by Legardye, who testified that defendant was Longmiyer's friend, not hers. And Chaparro stated that she believed she saw three males in the alley at the time of the shooting.

are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094; see also *In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) "Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility. [Citation.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530.) Additionally, "advance knowledge is not a prerequisite for liability as an aider and abettor. 'Aiding and abetting may be committed "on the spur of the moment," that is, as instantaneously as the criminal act itself. [Citation.]' [Citation.]" (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 742.)

Here, there was substantial evidence at trial to support the inference that defendant knowingly and intentionally aided and abetted Longmiyer in the murder. First, as discussed above, the evidence supports the conclusion that Longmiyer was in the alley and intentionally delivered a fatal gunshot to Davis at close range. The evidence also established that Longmiyer and defendant were friends, that Longmiyer and Fowler were cousins, and that these three individuals communicated with each other repeatedly on the morning of the shooting, including a call from Davis's phone to Longmiyer's phone minutes before the shooting. The jury reasonably could infer Fowler made this call to Longmiyer while Davis was inside the liquor store. After Fowler made her last pre-shooting call to Longmiyer from Davis's phone, she called 911 from her home phone, rather than her cell phone. She later lied to police after the shooting, stating her cell phone was not working that day. From these facts the jury could infer that Fowler was attempting to conceal evidence of their pre-arranged plan.

There was also substantial evidence at trial placing defendant at the scene at the time of the shooting. Defendant suggests that the evidence of his DNA on Davis's knuckles is the "only" evidence of his involvement and is insufficient to sustain his conviction. We disagree with defendant's attempt to minimize the significance of the DNA evidence and reject his effort to ignore the additional evidence put forth at trial. The record showed that Davis sustained significant injuries from an assault, including

14

bruising, lacerations and having his braided hair ripped out. Defendant's DNA, matching sufficiently to generate a likelihood ratio of eight hundred million to one, was found on Davis's right knuckles, along with significant bruising. While defendant now attempts to suggest that the DNA could have been placed there by some earlier handshake, his own expert acknowledged that a handshake would most likely transfer DNA (if any) to the other person's palm. The location of defendant's DNA on Davis's knuckles, along with Davis's injuries, allowed the jury to reasonably conclude that defendant assaulted Davis and Davis tried to fight back.

Further, the freshness of Davis's wounds, the evidence of blood and hair in the alley, as well as the short period of time between when Davis and Fowler left the liquor store and when Fowler called 911, support the inference that defendant's assault of Davis took place in the alley, shortly before he was shot.[11] Additionally, the cell phone records showing that defendant had frequent contact with Longmiyer and Fowler during the morning of August 2, but then had no phone contact for about three hours surrounding the time of the shooting, support the inference that defendant and Longmiyer were together during this period. Finally, the record shows that Chaparro saw at least two cars leaving the scene immediately after the shooting and did not see any individuals remaining in the alley, and that Longmiyer's cell phone used a cell tower farther away from the alley within minutes after the shooting. This evidence suggests that defendant and Longmiyer left the alley immediately after the shooting; a circumstance supporting the inference that they were working together and that defendant had the knowledge and intent to carry out the murder.

---

[11] These facts distinguish this case from *People v. Trevino* (1985) 39 Cal.3d 667, disapproved on another ground in *People v. Johnson* (1989) 47 Cal.3d 1194, 1221, cited by defendant in his reply brief. In *Trevino*, the only evidence connecting defendant with the crime was a fingerprint found on an unopened dresser drawer in the victim's bedroom. (*Id*. at 696.) There was no other evidence establishing how or when it came to be placed there, other than testimony that defendant occasionally visited the victim's home prior to the murder (*Id*. at pp. 696-697.) The court acquitted defendant, finding that "[t]his kind of guesswork as to the facts does not elevate speculation to the level of reasonable inference." (*Id*. at p. 697.)

15

Thus, the jury reasonably could have concluded that Longmiyer, Fowler, and defendant engaged in a plan to carry out the attack on Davis, that Longmiyer and defendant travelled to the alley with at least one of them armed with a loaded gun in aid of that plan, and that by assaulting Davis, defendant intended to and did assist Longmiyer in carrying out the crime.[12] In sum, after viewing the evidence in the light most favorable to the prosecution, we conclude the record contains substantial evidence from which the jury could have found beyond a reasonable doubt that defendant knew of and shared Longmiyer's intent to kill Davis and acted to further the shooting.

## II.      Instruction on Lesser Included Offense

Defendant contends that the trial court erred in refusing to instruct the jury on involuntary manslaughter as a lesser included offense to murder. We find no error.

### A.      *Factual Background*

During trial, defense counsel requested an instruction on the lesser-included offenses of voluntary and involuntary manslaughter. He argued that "with all the vague testimony that's in this trial, maybe a jury can conclude that there is no robbery, no attempted robbery, and somehow that there was a homicide with some type of mutual combat, which [would] support a voluntary manslaughter, and/or conclude that maybe there was some type of negligent discharge in support of involuntary manslaughter." The People argued that the only reasonable inference from the evidence was that Davis was attacked in the alley and that there was no evidence to support a finding that the gun negligently discharged. The court agreed, finding that there was no substantial evidence to support the giving of either instruction.

### B.      *Governing Principles*

"[A] trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, . . . whenever there is substantial evidence raising

---

[12] The lack of an established robbery motive does not undercut this finding. (See *People v. Houston*, *supra*, 54 Cal.4th at p. 1218 ["Although motive is often probative of an intent to kill, the absence of a clear motive does not demonstrate the lack of an intent to kill."].)

a question as to whether all of the elements of the charged greater offense are present. [Citations.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) "[T]his does not mean that the trial court must instruct sua sponte on the panoply of all possible lesser included offenses. Rather, . . . '"such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"'" that the lesser offense, but not the greater, was committed."' [Citation.]" (*Ibid.*; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162.)

On appeal, "[w]e review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant [citations]." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 *(Brothers)*.)

C.      *Analysis*

Defendant challenges only the court's failure to instruct on involuntary manslaughter. We conclude there was no substantial evidence at trial to support such an instruction.

"One commits involuntary manslaughter either by committing 'an unlawful act, not amounting to a felony' or by committing 'a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue." (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

Defendant does not advance the argument he did below regarding negligent discharge of the gun as support for an involuntary manslaughter theory. Instead, he argues that even assuming he assaulted Davis, there was substantial evidence showing that he lacked an intent to kill. Specifically, he relies on a recent line of cases requiring an instruction on involuntary manslaughter as a lesser included offense when "a rational

17

jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*Brothers, supra,* 236 Cal.App.4th at p. 33.)

In *Brothers*, the defendant beat the victim "repeatedly on the head and face with the large wooden broom handle with great force," causing blunt force trauma that contributed to the victim's death. (*Brothers, supra,* 236 Cal.App.4th at p. 34.) The court found no evidence supporting an instruction on involuntary manslaughter, explaining that "there was simply no evidence from which a reasonable juror could entertain a reasonable doubt that Brothers had acted in conscious disregard of the risk her conduct posed to Gates's life. . . . There was no evidence of an accidental killing, gross negligence or Brothers's own lack of subjective understanding of the risk to Gates's life that her and her confederates' conduct posed. On this record, the trial court had no sua sponte duty to instruct the jury on involuntary manslaughter. (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 1028 [involuntary manslaughter instruction unwarranted . . . when the evidence left no room for reasonable doubt that the defendant acted with intent to kill or conscious disregard for human life; 'each appellant knew the risk involved to Chamberlain when they violently attacked him']; see generally *People v. Evers* (1992) 10 Cal.App.4th 588, 596 ['If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice' unless the malice is otherwise negated by heat of passion or imperfect self-defense.].)" (*Brothers, supr*a, 236 Cal.App.4th at pp. 34–35.)

Here, as discussed above, there is no evidence from which a jury could reasonably conclude that the shooter acted without an intent to kill. The fatal shot to Davis delivered at extremely close range was clearly intentional and precludes the suggestion that the shooter acted without, at the very least, implied malice, i.e., a conscious disregard for Davis's life. (*Brothers*, *supra*, 236 Cal.App.4th at pp. 34–35.) There is no evidence to

suggest that the shooter's actions were unintentional or negligent. Thus, an instruction on involuntary manslaughter was unwarranted as to the shooter.

On the other hand, if we assume defendant was not the shooter, his guilt hinges on his intent and actions in aiding and abetting the murder. If defendant knew that Longmiyer (as the presumed shooter) intended to kill Davis and he took steps to aid the commission of that crime, he would be liable for murder as an aider and abettor. Instead, if defendant merely assaulted Davis but did not know of Longmiyer's intent to kill, as defendant now suggests, then he would not be liable for the killing under any theory argued at trial. Either way, there would be no basis to establish involuntary manslaughter as an applicable lesser included offense. We therefore conclude that the court did not err in refusing to instruct the jury on involuntary manslaughter.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

19